863 So.2d 343 (2003)
SHANDS TEACHING HOSPITAL AND CLINIC, INC., Appellant/Cross-Appellee,
v.
Gary JULIANA, II, a minor child, by and through his parents and natural guardians, Gary Juliana and Kimberly Juliana, and Gary Juliana and Kimberly Juliana, individually, Appellees/Cross-Appellants.
No. 1D02-1530.
District Court of Appeal of Florida, First District.
August 29, 2003.
*344 Arthur J. England, Jr., Esquire and Elliot B. Kula, Esquire of Greenberg Traurig, P.A., Miami and John D. Jopling, Esquire and David M. Delaney, Esquire of Dell Graham, P.A., Gainesville, for Appellant/Cross-Appellee.
Christopher Jayson, Esquire, Arthur B. Skafidas, Esquire and Barry Cohen, Esquire of Cohen, Jayson & Foster, P.A., Tampa, for Appellees/Cross-Appellants.
BENTON, J.
Shands Teaching Hospital and Clinic, Inc. (Shands) asks us to reverse a final judgment (and antecedent partial summary judgment) holding it responsible for injuries that a heart-lung machine operator's conceded negligence caused Gary Juliana, II, (Gary) during open-heart surgery. On cross-appeal, Gary's parents, individually and on Gary's behalf, argue that the trial court erred in denying their motion for leave to amend their complaint to add a claim for punitive damages; in refusing to grant leave to amend two counts without a showing of compliance with presuit requirements; and in allowing certain testimony on future economic damages at the trial on damages. We affirm in all respects.[1]
When he was two months old, Gary was rushed to Shands on January 30, 1996. A pediatrician in Ocala had detected both a heart murmur and respiratory distress. At Shands, Gary's parents signed a "Shands Hospital Certification and Authorization" form (admission form) consenting to "such diagnostic procedures, hospital care, [and] medical treatment ... which in the judgment of my physician may be considered necessary or advisable while a patient at Shands" and agreeing to pay for such services at rates "listed in the *345 current Billing Charge Manuals which are available for inspection upon request and incorporated herein by reference." The form excluded the services of "all physicians, residents and students who provide services in Shands," but not any other services, from the definition of "hospital care, [and] medical treatment," by notifying the reader that "all physicians, residents and students who provide services in Shands ... are employees, agents or servants of the University of Florida, Board of Regents, and are not employees, agents or students of Shands...."[2]
After Gary's physicians decided that he needed open-heart surgery and his parents had given their consent by signing a form "Anesthesia and Operating Permit," he underwent surgery on February 2, 1996. Among the operating room personnel was a perfusionist,[3] although Gary's parents did not know it at the time. Perfusion entails "the artificial passage of fluid, usually blood, through blood vessels (as by a pump during open-heart surgery)." J.E. Schmidt, M.D., 4 Att'ys Dictionary of Med. & Word Finder P-8445 (MB 2002). The perfusionist operates a heart-lung or cardiopulmonary bypass machine, which "consists of a pump with tubes which are used to suction blood from the patient's body and return it to his arteries after the blood has been oxygenated." Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331, 1333 (La.1978). Blood gas analyzers, one of which the perfusionist operates, make it possible to monitor blood gas and pH levels. Part of the perfusionist's job is regulating the "proper oxygen and carbon dioxide content and the proper acid/base ratio in the blood by adjusting blood flow and pressure and by adding drugs and solutions to the circulation. Deviations from acceptable levels endanger the patient." Robinson v. Magovern, 521 F.Supp. 842, 856 (D.C.Pa.1981).
Before and during surgery, the perfusionist evaluates intermittent blood samples using a blood gas analyzer in the operating room. Occasionally, in order to verify the calibration of the operating room's blood gas analyzer, the perfusionist requests the "stat lab," which at Shands is located approximately 150 feet from the operating room, to run a blood sample on the stat lab's blood gas analyzer. Both the perfusionist and the "stat lab" receive data from the operating room's blood gas analyzer. A stat lab technician is charged with the responsibility of advising the perfusionist of any abnormalities in blood gas *346 levels by calling him at a telephone in the operating room. If the perfusionist detects blood gas levels in an abnormal range or if the stat lab reports abnormal ranges to the perfusionist, the perfusionist is supposed to communicate the situation to the surgeon and to the anesthesiologist, to re-check the blood gas levels in the operating room, and to make necessary adjustments to bring the blood gas levels within normal ranges.
In Gary's case, blood gas levels at 10:15 on the morning of his surgery, as recorded in the stat lab's report, were abnormal, dangerous, and different from the (normal) blood gas levels the perfusionist recorded in the operating room's report for the same time. The perfusionist neither notified the surgical team of problematic blood gas levels nor attempted to make any adjustments.[4] Shands stipulated that Gary's injuries resulted from the perfusionist's negligence, stating: "Defendant Shands concedes, for purposes of trial and any future appellate review, both the negligence of [the] perfusionist ... and the causal relationship of that negligence to the injury complained of by the Plaintiffs." The surgery successfully corrected Gary's heart malformation, but, as a result of the perfusionist's negligence, Gary suffered severe brain damage and now has cerebral palsy, among other things.
In the trial court, the Julianas moved for partial summary judgment, arguing that Shands was vicariously liable as a matter of law for the perfusionist's negligence. The Julianas maintained that Shands had undertaken to provide perfusion services when it agreed to provide "hospital care, [and] medical treatment," and that Shands had breached a nondelegable duty both because it had a contractual obligation it could not extinguish by subcontracting with Cardiovascular Perfusionists, Inc. (CVP), and because providing perfusion services is inherently dangerous. See generally Restatement (Second) of Torts § 416 (1965) ("One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.").
Shands filed a cross-motion for summary judgment arguing that it was not responsible for the perfusionist's negligence because neither the perfusionist nor his employer, CVP, was Shands's agent in fact or reasonably appeared to have been, and contending no dispute of material fact existed on either question.
In a supplemental motion for summary judgment, the Julianas argued that Shands was under a nondelegable duty, not only for the reasons stated in its initial motion, but also because it was acting pursuant to a state license under regulations that required it to furnish perfusionists' services as part of offering open-heart surgery. See generally NME Props., Inc. v. Rudich, 840 So.2d 309, 313 (Fla. 4th DCA 2003) (holding nursing home owner liable for independent contractor's negligence); Restatement (Second) of Torts § 424 (1965) ("One who by statute or by administrative regulation is under a duty to provide specified *347 safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.").
At the hearing on these motions, the Julianas argued that Shands's cross-motion should be denied because material factual questions pertinent to the agency issues remained in dispute.[5] At the same time, the Julianas repeatedly contended below, as they contend here, that Shands is liable for the perfusionist's negligence on all three of the theories of nondelegable duty that they have advanced. We find it necessary to discuss only the first of these theories.
The trial court (the Hon. Nath C. Doughtie) granted partial summary judgment in favor of the Julianas, and denied Shands's cross-motion for summary judgment, holding:
It might be said that the perfusionist has been hired by the hospital to provide services in the same way that an operating room nurse provides services.
When a patient enters a hospital, the patient agrees to pay the hospital for certain unspecified services. Although the contract between the patient and the hospital may not completely spell out the services, it is generally understood that nursing services will be provided. If the hospital opts to sub-contract out nursing services to a private nursing firm, that does not relieve the hospital of its obligations under its contract with the patient to provide nursing services. If a nurse commits negligence, the hospital will be liable since in effect it agreed to provide competent nursing services to the patient.... The patient did not employ Cardiovascular Perfusionists, Inc. It was Shands that did. Shands was billed by its sub-contractor at the rate of $550.00 for the perfusionist and $250.00 for a "cell saver". Shands then billed the patient $2,500.00 for the open heart pump equipment and operator, plus $953.00 for the "cell saver".
Shands is clearly liable as a matter of law for the negligence of its sub-contractor.
In the order denying motion for rehearing, the trial court (the Hon. Chester B. Chance) ruled:
In the case before the Court the duty of the hospital arose from contract. The duty could not be delegated since the service was contracted for. The hospital provided the services of the perfusionist. If the hospital had wished for the patient to obtain his own perfusionist it might have been possible to advise the patient that this was his responsibility. This certainly was not done. The fact that the hospital chose to retain the services of the perfusionist as an independent contractor rather than an employee is immaterial in the relationship between the hospital and the patient.
... Certainly a hospital should have the ability to refer a patient to an independent contractor for services. That was not done in this case. The perfusionist was legally a subcontractor to the hospital and was not retained in any way by the Plaintiff. The duty [to] the Plaintiff could not be unilaterally delegated *348 by the hospital without some very specific notice to the Plaintiff.
... Perfusionists are not physicians, and the apparent agency law need not be considered any more than [in] the case of nurses. It would be contrary to public policy for a hospital to try to avoid liability for nurse negligence by retaining them as "independent contractors" without clearly advising patients of this upon admission.
Liability thus established, only the amount of damages was tried to the jury. After various offsets, judgment was entered against Shands on the basis of the verdict in the amount of $9,138,848.03.
On appeal, Shands argues that the Julianas were not entitled to recover on any theory of nondelegable duty and that the case should be remanded for trial on the agency theories that the Julianas conceded below depended on facts in dispute. The rule of decision is:
Summary judgment should be granted only where it is clear that no issues of material fact exist. Craig v. Gate Maritime Properties, 631 So.2d 375, 377 (Fla. 1st DCA 1994); Hancock v. Department of Corrections, 585 So.2d 1068 (Fla. 1st DCA 1991), review denied, 598 So.2d 75 (Fla.1992). The movant's proof must be conclusive; all reasonable inferences which may be drawn in favor of the opposing party must be overcome. Landers v. Milton, 370 So.2d 368, 370 (Fla.1979); Holl v. Talcott, 191 So.2d 40, 43-44 (Fla.1966); Craig, 631 So.2d at 377. "[I]f the record raises even the slightest doubt that an issue [of material fact] might exist, summary judgment is improper." Craig, 631 So.2d at 377, citing, Holland v. Verheul, 583 So.2d 788, 789 (Fla. 2d DCA 1991). Particular caution should be employed when granting summary judgment in negligence actions. Moore v. Morris, 475 So.2d 666, 668 (Fla.1985); Johnson v. Deep South Crane Rentals, Inc., 634 So.2d 1113, 1113-14 (Fla. 1st DCA 1994).
Lindsey v. Bill Arflin Bonding Agency Inc., 645 So.2d 565, 566-67 (Fla. 1st DCA 1994). Accord Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). Applying these precepts, we approve the trial court's analysis regarding nondelegable duty and affirm, because any factual disputes on other theories are immaterial.
Shands argues that it can have no vicarious liability for the perfusionist's negligence if CVP is an independent contractor, and that it is entitled to prove at trial that CVP is an independent contractor. Although Shands's arrangement with CVP is apparently not the norm[6], it is not clear what purpose a trial would serve. The parties agreed in effect that the summary judgment motions should be decided on the assumption that Shands obtains perfusionists' services, not by employing perfusionists directly, but by contracting with CVP, which was organized for that purpose in 1991, and that CVP has agreed to and does supply perfusionists who provide perfusion services exclusively at Shands. No dispute of material fact exists under the theory of nondelegable duty relied on by the trial court.
When it rejected Shands's contention that its arrangement with CVP insulated CVP from liability for the perfusionist's negligence, the trial court did not grant summary judgment on an undeveloped *349 record. Among other things,[7] it considered the contract between Shands and CVP. Under this contract, Shands is responsible for providing perfusion equipment, including cardiopulmonary bypass machines and blood gas analyzers, for the perfusionists' use in the operating room,[8] as well as office space and supplies for the perfusionists' administrative duties. The contract recites:
Both parties expressly intend that with regard to the provisions of this Agreement, said parties shall be independent contractors and no party hereto shall receive any other benefits besides those expressly provided for herein. Further, it is the express intent of the parties hereto that no agent, servant, contractor or employee of one party be deemed any agent, servant, contractor or employee of the other party.
But this recital is not determinative (either on the question whether perfusionists should be deemed Shands's employees or) on the question of Shands's liability to third parties for breach of its agreements with them. See Mills v. Krauss, 114 So.2d 817, 820 (Fla. 2d DCA 1959) (reversing summary judgment in favor of a general contractor on grounds that a general contractor may be liable for the negligence of a subcontractor in discharging contractual obligations to a third party, despite language in the contract between the general and the sub declaring the subcontractor an independent contractor).
The present case differs importantly from cases in which physicians, as opposed to nurses or technologists, have established independent contractor relationships with hospitals. The general rule is that a hospital is not liable for the negligent acts of a physician who is not its employee, but an independent contractor. See Pub. Health Trust of Dade County v. Valcin, 507 So.2d 596, 601 (Fla.1987) ("Generally, however, a hospital may not fairly be held liable for a plaintiff's entire damages solely based on the omissions of an independent contractor merely granted practicing privileges in the hospital.").[9] This general rule mirrors longstanding custom and usage: Patients normally contract separately for physicians' services, but do not normally contract separately for the services of hospital-based nurses and technologists.
*350 Unlike Shands's disclaimer of liability for the negligence of the physicians, residents, and students in the employ of the University of Florida, nothing in the admission form or operating permit gave notice that the perfusionist was not discharging Shands's duties under its contract with the Julianas. Shands schedules the perfusionists' hours. It provides them with a tentative schedule of the week's operations every Monday, and daily with a confirmed schedule of the following day's operations.[10] Perfusionists cannot work at Shands without the surgery department's prior approval. They must first be credentialed in accordance with standards set out in Shands's bylaws. For its own account, Shands billed the Julianas for the perfusionist's services.
The possibility that CVP could be found to be an independent contractor (and the perfusionist its employee, not Shands's) does not alter the fact that Shands breached the contractual undertaking it made to the Julianas. See Atchley v. First Union Bank of Fla., 576 So.2d 340, 344 (Fla. 5th DCA 1991) (reversing summary judgment in bank's favor on grounds that the bank could be liable for a roofer's negligence, despite the general rule that an employer is not liable for the negligence of an independent contractor, where the bank specifically, contractually undertook to repair the roof).
The pleadings, depositions, answers to interrogatories, admissions on file and affidavits reveal no dispute about the fact that the admission form the Julianas signed reflected a broad undertaking by Shands to provide "hospital care, [and] medical treatment," in exchange for the Julianas' agreement to pay for those services. Perfusion services plainly fall within the definition of "hospital care, [and] medical treatment." Shands's counsel acknowledged that "the patients have a contract with Shands." Shands agreed to and did furnish Gary hospital services, including the services the perfusionist negligently provided to Gary.
Shands also argues that liability on the part of Gary's surgeon cannot categorically be ruled out,[11] and that entry of summary judgment holding Shands liable was improper for that reason. This argument ignores the fact that more than one person or entity may have to answer in damages for the same injury. A hospital and a surgeon may both be liable for a perfusionist's negligence in certain circumstances. See Vargas v. Dulzaides, 520 So.2d 306, 308 (Fla. 3d DCA 1988). (Here CVP's liability and that of the perfusionist has already been conceded.) At issue at this point in the present case, however, is Shands's liability, not that of any other person or entity. On this record, Shands's vicarious liability for the perfusionist's negligence is clear.
Affirmed.
POLSTON, J., concurs.
WEBSTER, J., concurs in result only.
NOTES
[1] On the cross-appeal, our affirmance is without further discussion of the cross-appellants' contentions.
[2] By signing the admission form, the Julianas acknowledged that they had been advised that:

[A]ll physicians, residents and students who provide services in Shands ... are employees, agents or servants of the University of Florida, Board of Regents, and are not employees, agents or students of Shands .... [and] that the law limits the liability for acts or omissions of employees, agents or servants of the State of Florida, including the Board of Regents, to $100,000 per claim and $200,000 per incident.
The Billing Charge Manuals are not part of the record.
[3] An essential member of an open-heart surgical team, the perfusionist is a technician or technologist who works closely with surgeons and anesthesiologists. The Attorneys Medical Deskbook 3D indicates no requirement for higher education beyond training that "[v]aries from 12-24 months in a perfusionist program." 1 Dan J. Tennenhouse, Att'ys Med. Deskbook 3D § 6:13 (3d ed.1993). At Shands, the Chief Cardiovascular Perfusionist must now, according to Cardiovascular Perfusion: Policy and Procedure Manual (1994) (attached as an exhibit to the deposition given by Shands's Chief of the Division of Thoracic and Cardiovascular Surgery), be a "[g]raduate in cardiac perfusion from an accredited school," including "[t]wo years of sciences and two years of cardiovascular perfusion study," and "[s]hall have filed an application toward Board Certification by the American Board of Cardiovascular Perfusion."
[4] After a period of working under a colleague's supervision following being out of work altogether for more than a year, the perfusionist had recently resumed working without the supervision of another perfusionist. His time off work began when an aneurys in one of his vertebral arteries burst, resulting in neurologic injury "as if he had had a stroke."
[5] Whether this argument was fully consonant with the Julianas' position on their own motions for summary judgment may be questioned, as Shands has done. In context, the Julianas' concession went to the question of independent contractor status. Their position boiled down to the contention that Shands had a nondelegable duty, even if CVP was an independent contractor, and the perfusionist was not deemed a hospital employee.
[6] In its description of health professionals, the Attorneys Medical Deskbook 3D includes the following in its discussion of perfusionists: "SALARIED: Usually by acute care hospitals." Tennenhouse, supra note 3, § 6:13.
[7] Neither CVP nor the perfusionist was employed by or under contract to the surgeon, the anesthesiologist or any other person or entity that played a part in Gary's open-heart surgery, other than Shands.
[8] Shands, rather than CVP, is solely responsible for quality control assessments and maintenance of the cardiopulmonary bypass machines and blood gas analyzers.
[9] Even where a physician is an independent contractor, however, a hospital that "undertakes by [express or implied] contract to do for another a given thing" is not allowed to "escape [its] contractual liability [to the patient] by delegating performance under a contract to an independent contractor." Irving v. Doctors Hosp. of Lake Worth, Inc., 415 So.2d 55, 57 n. 2, 59, 60 (Fla. 4th DCA 1982)(reversing summary judgment in favor of hospital at plaintiff's behest and remanding with directions that the jury be instructed on nondelegable duty). See also Orlando Reg'l Med. Ctr. v. Chmielewski, 573 So.2d 876, 880 (Fla. 5th DCA 1990); Hippocrates Mertsaris v. 73rd Corp., 105 A.D.2d 67, 482 N.Y.S.2d 792, 801 (1984)("The evidence at trial established that... the anesthesiologist, had an office within the hospital, had a `practice' exclusively limited to hospital patients, would have the hospital bill patients for his services, ... [and] would be summoned to patients by a nurse when needed.... In circumstances like these, where the physician is not privately retained by the patient and his activities are controlled by the hospital, courts have held hospitals vicariously liable for the malpractice of the doctor notwithstanding any claim that he was an independent contractor.").
[10] When surgeons schedule operations requiring a perfusionist's services on nights or weekends, a Shands operating room or intensive care employee summons the perfusionist on call.
[11] This contention rings hollow inasmuch as Shands has never alleged the slightest fault on the part of the surgeon, despite the requirements laid down by Fabre v. Marin, 623 So.2d 1182 (Fla.1993), and Nash v. Wells Fargo Guard Servs., Inc., 678 So.2d 1262, 1264 (Fla. 1996). The Julianas' claim against the surgeon was decided in the surgeon's favor on summary judgment, which was not appealed.